1
2
3
4
5
6
7
8            **IN THE UNITED STATES DISTRICT COURT**
9            **FOR THE EASTERN DISTRICT OF CALIFORNIA**
10
11   ALEXANDER LOPEZ,                           No.  2:22-CV-1032-DJC-DMC-P
12                    Petitioner,
                                                FINDINGS AND RECOMMENDATIONS
13          v.
14   PATRICK COVELLO,
15                    Respondent.
16
17          Petitioner, a state prisoner proceeding pro se, brings this petition for a writ of

18   habeas corpus under 28 U.S.C. § 2254.  Pending before the Court are Petitioner's petition for a

19   writ of habeas corpus, ECF No. 1, and Respondent's answer, ECF No. 10.  Petitioner did not file

20   a traverse.  Respondent has lodged the state court record, ECF No. 9.

21          Because this action was filed after April 26, 1996, the provisions of the

22   Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") are presumptively applicable.

23   See Lindh v. Murphy, 521 U.S. 320, 336 (1997); Calderon v. United States Dist. Ct. (Beeler), 128

24   F.3d 1283, 1287 (9th Cir. 1997), cert. denied, 522 U.S. 1099 (1998).  Under AEDPA, federal

25   habeas relief under 28 U.S.C. § 2254(d) is not available for any claim decided on the merits in

26   / / /

27   / / /

28   / / /

                                                1

state court proceedings unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Under § 2254(d)(1), federal habeas relief is available only where the state court's decision is "contrary to" or represents an "unreasonable application of" clearly established law. Under both standards, "clearly established law" means those holdings of the United States Supreme Court as of the time of the relevant state court decision. See Carey v. Musladin, 549 U.S. 70, 74 (2006) (citing Williams, 529 U.S. at 412). "What matters are the holdings of the Supreme Court, not the holdings of lower federal courts." Plumlee v. Masto, 512 F.3d 1204 (9th Cir. 2008) (en banc). Supreme Court precedent is not clearly established law, and therefore federal habeas relief is unavailable, unless it "squarely addresses" an issue. See Moses v. Payne, 555 F.3d 742, 753-54 (9th Cir. 2009) (citing Wright v. Van Patten, 552 U.S. 120, 28 S. Ct. 743, 746 (2008)). For federal law to be clearly established, the Supreme Court must provide a "categorical answer" to the question before the state court. See id.; see also Carey, 549 U.S. at 76-77 (holding that a state court's decision that a defendant was not prejudiced by spectators' conduct at trial was not contrary to, or an unreasonable application of, the Supreme Court's test for determining prejudice created by state conduct at trial because the Court had never applied the test to spectators' conduct). Circuit court precedent may not be used to fill open questions in the Supreme Court's holdings. See Carey, 549 U.S. at 74.

In Williams v. Taylor, 529 U.S. 362 (2000) (O'Connor, J., concurring, garnering a majority of the Court), the United States Supreme Court explained these different standards. A state court decision is "contrary to" Supreme Court precedent if it is opposite to that reached by the Supreme Court on the same question of law, or if the state court decides the case differently than the Supreme Court has on a set of materially indistinguishable facts. See id. at 405. A state court decision is also "contrary to" established law if it applies a rule which contradicts the governing law set forth in Supreme Court cases. See id. In sum, the petitioner must demonstrate

2

that Supreme Court precedent requires a contrary outcome because the state court applied the wrong legal rules. Thus, a state court decision applying the correct legal rule from Supreme Court cases to the facts of a particular case is not reviewed under the "contrary to" standard. See id. at 406. If a state court decision is "contrary to" clearly established law, it is reviewed to determine first whether it resulted in constitutional error. See Benn v. Lambert, 283 F.3d 1040, 1052 n.6 (9th Cir. 2002). If so, the next question is whether such error was structural, in which case federal habeas relief is warranted. See id. If the error was not structural, the final question is whether the error had a substantial and injurious effect on the verdict, or was harmless. See id.

State court decisions are reviewed under the far more deferential "unreasonable application of" standard where it identifies the correct legal rule from Supreme Court cases, but unreasonably applies the rule to the facts of a particular case. See Wiggins v. Smith, 539 U.S. 510, 520 (2003). While declining to rule on the issue, the Supreme Court in Williams, suggested that federal habeas relief may be available under this standard where the state court either unreasonably extends a legal principle to a new context where it should not apply, or unreasonably refuses to extend that principle to a new context where it should apply. See Williams, 529 U.S. at 408-09. The Supreme Court has, however, made it clear that a state court decision is not an "unreasonable application of" controlling law simply because it is an erroneous or incorrect application of federal law. See id. at 410; see also Lockyer v. Andrade, 538 U.S. 63, 75-76 (2003). An "unreasonable application of" controlling law cannot necessarily be found even where the federal habeas court concludes that the state court decision is clearly erroneous. See Lockyer, 538 U.S. at 75-76. This is because "[t]he gloss of clear error fails to give proper deference to state courts by conflating error (even clear error) with unreasonableness." Id. at 75. As with state court decisions which are "contrary to" established federal law, where a state court decision is an "unreasonable application of" controlling law, federal habeas relief is nonetheless unavailable if the error was non-structural and harmless. See Benn, 283 F.3d at 1052 n.6.

/ / /

/ / /

/ / /

3

1    The "unreasonable application of" standard also applies where the state court

2    denies a claim without providing any reasoning whatsoever.  See Himes v. Thompson, 336 F.3d

3    848, 853 (9th Cir. 2003); Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2000).   Such decisions

4    are considered adjudications on the merits and are, therefore, entitled to deference under the

5    AEDPA.  See Green v. Lambert, 288 F.3d 1081 1089 (9th Cir. 2002); Delgado, 223 F.3d at 982.

6    The federal habeas court assumes that state court applied the correct law and analyzes whether the

7    state court's summary denial was based on an objectively unreasonable application of that law.

8    See Himes, 336 F.3d at 853; Delgado, 223 F.3d at 982.

9

10                                    **I.  BACKGROUND**

11        A.    **Facts**[1]

12            The state court recited the following facts, and Petitioner has not offered any clear

13    and convincing evidence to rebut the presumption that these facts are correct:

14            M.J. was working as an attendant at a Sacramento gas station on
       the evening of July 25, 2017. M.J. was outside, cleaning the front parking
15     lot just before 10:00 p.m. He watched as a battered car pulled into the
       parking lot and backed into a space next to a retaining wall running
16     perpendicular to the storefront and gas pumps. A man, later identified as
       Rudy Z., got out of the car on the driver's side and stood near the wall.[2]
17     M.J. began sweeping the area in front of the store, moving towards the
       wall and the parked car. As he drew closer, M.J. asked the driver, "Amigo,
18     what happened to your vehicle?" Around that time, a second man, later
       identified as defendant, emerged from the passenger's side of the parked
19     car. M.J. recognized defendant and Rudy as occasional customers at the
       gas station.
20
            [N.2] Rudy and Ramon Z. are brothers, who each play
21          a role in this case.  We will refer to them by their first
            names for clarity.  Defendant is Rudy and Ramon's uncle.
22

23     / / /

24    _____

25         [1]      Pursuant to 28 U.S.C. § 2254(e)(1), ". . . a determination of a factual issue made
       by a State court shall be presumed to be correct."  Findings of fact in the last reasoned state court
26     decision are entitled to a presumption of correctness, rebuttable only by clear and convincing
       evidence.  See Runningeagle v. Ryan, 686 F.3d 759 n.1 (9th Cir. 2012).  Petitioner bears the
27     burden of rebutting this presumption by clear and convincing evidence.  See id.  These facts are,
       therefore, drawn from the state court's opinion(s), lodged in this court.  Petitioner may also be
28     referred to as "defendant."

                                            4

Defendant "kind of pushed" M.J. in the chest, saying, "Don't come closer; you go away from here." M.J. thought that defendant seemed drunk. Rudy said to M.J., "You know what, he's a nice guy; don't say anything to him." M.J. continued sweeping, and Rudy went into the store. Defendant got back into the car on the passenger's side.

Moments later, Rudy emerged from the store with a box of Modelo beer. He returned to the car and took his seat behind the steering wheel. As he did so, a third man, later identified as Ramon Z., appeared at the gas station, seemingly on foot. Ramon, then age 15, approached the car on foot. The car had by now begun to pull out from the parking space. The car stopped, and Ramon leaned over next to the driver's side window. Ramon spoke with the occupants of the car for approximately 40 seconds. Rudy and Ramon Z. are brothers, who each play a role in this case. We will refer to them by their first names for clarity. Defendant is Rudy and Ramon's uncle.

In the meantime, M.J. finished sweeping and emptied the trash cans in front of the store. M.J.'s coworker, Simranjit Singh, made several trips carrying recycling from the store to the dumpsters around the corner. M.J. kept an eye on the car as he worked. M.J. recognized Ramon as another customer of the gas station.

The conversation between Ramon and the occupants of the car came to an end. Singh emerged from the store carrying a large quantity of cardboard recycling. Singh headed towards the dumpsters. M.J. busied himself near the front of the store.

Ramon started walking towards the store. The car started moving towards the store as well, moving in a slow zigzag that forced Ramon to walk behind, and then to the side.

Ramon approached M.J., who was standing near the door to the store. Ramon, who was wearing gloves, asked M.J., "Why are you looking at us?" M.J. responded, "I'm not looking at you; I'm looking at my parking lot, whether it is clean or not."

While these events were unfolding, the car was moving slowly past the front door of the store. Video from the store's surveillance cameras shows defendant sitting in the passenger's seat and craning his neck to watch the confrontation between Ramon and M.J. Defendant appears to be smiling broadly and laughing or giggling. The car came to a stop halfway between the store and the gas pumps, and defendant slowly opened the door, taking care to place his beer in the center console.

As defendant was emerging from the car, Ramon suddenly punched M.J. in the face, causing his glasses to go flying. M.J. grabbed a broom and swung, striking Ramon in the side and causing him to retreat. Defendant had by now emerged from the car. Singh was standing nearby. M.J. ran inside to call police. Ramon, still retreating, crossed in front of defendant. Ramon stopped on defendant's left side, just a few feet away. Defendant watched as Ramon withdrew a gun from the waistband of his shorts and racked the slide. He then raised his arm and pointed at Singh, who was standing near the store. Defendant walked towards Singh with his arm extended, still pointing and seeming to smile. Ramon raised the gun and fired at Singh.

Ramon shot Singh 12 times, in rapid succession. Defendant reacted to the shots by bringing his outstretched arm to his chest and hunching his shoulders, as if to protect himself from the expended shells. He then turned and walked slowly back to the car. The car drove away, leaving Singh dead on the ground.

5

1

2

3

        The trio made their way to the home of defendant's sister (Rudy and Ramon's mother). Defendant passed out on the living room sofa; it was obvious that he had been drinking. Rudy and Ramon left their mother's home in the night. She later received word that they had gone to Mexico. Police arrived in the early hours of the morning.

4

5

6

7

8

        Defendant was arrested and charged by amended consolidated felony complaint with murder. The complaint further alleged that a principal in the offense was armed with a firearm. Defendant pled not guilty and denied the allegation. The matter was tried
to a jury over the course of four days in January 2019. The prosecution's witnesses testified substantially as described ante. M.J. also testified that he did not hear anything that might have been said between Ramon and Rudy or defendant, and he did not see a
gun that night. Defendant's sister (and Ramon's mother) also testified that defendant and Ramon were very close, and defendant acted as a surrogate father to Ramon. Defendant testified on his own behalf.[3]

9

10

        [N.3] Defendant's mother and ex-wife also testified for the defense.  Their testimony does not have any bearing on any issue on appeal.

11

12

13

        As relevant here, defendant testified he smoked marijuana and drank 15 beers on the day of the murder. He explained that he struggled with alcohol and often had difficulty remembering things as a result of his drinking.

14

15

16

        Defendant remembered going to the gas station on the night of the murder and remembered M.J. approaching him in the parking lot. Defendant suggested that he thought that M.J. was getting too close to him, adding that he "put [his] hands out" and told him to "get back." Defendant testified that he recognized M.J. and Singh as a customer of the gas station and had never had any problems with either of them before.

17

18

19

20

        Defendant testified he next remembered Ramon appearing at the gas station as they were preparing to leave. Defendant recalled that Ramon argued with Rudy, and Rudy told Ramon to get in the car. Ramon approached M.J. instead. Defendant acknowledged watching and laughing as Ramon initiated an altercation with M.J. Defendant explained that the altercation prompted him to open the car door and get out. According to defendant, "it was time for me to tell Ramon to get his ass back in the car." He added, "I knew he was—most likely the police were coming. And so I was telling Ramon to get in the car so we can go home."

21

22

23

24

        Defendant next remembered seeing Singh come around the corner. However, defendant testified that he thought Singh was M.J. According to defendant, "It kind of surprised me to see him come around the corner so I was telling him to get back and for the other guy to get in the car—Ramon to get in the car." When he pointed to Singh (who he thought was M.J.), defendant explained, he was merely telling him to "get back" or "[s]tay back." Defendant testified that he was surprised to hear gunshots a few seconds later.

25

26

27

        Throughout his testimony, defendant insisted he had no idea Ramon had a gun or intended to shoot anyone. Defendant further testified that he harbored no animosity towards Singh or M.J., did not want Ramon to shoot Singh, and did not encourage Ramon to shoot Singh.

28

/ / /

6

During closing argument, the prosecutor argued that defendant, drunk, initiated an aggressive encounter with M.J. in the parking lot. The prosecutor observed that Ramon was not present for defendant's initial encounter with M.J., but immediately approached the gas station attendant after speaking with defendant and Rudy. The prosecutor argued that Ramon would have had no way of knowing there had been any issue with M.J., and no reason to confront him, had he not discussed the matter with defendant and Rudy. The prosecutor also argued that no one in the car made any attempt to stop Ramon from provoking an altercation with M.J., or to stop Ramon after the altercation with M.J. was over. Rather, the prosecutor argued, defendant stood by and watched as Ramon pulled the gun from his waistband and racked the slide. He then pointed to Singh. The prosecutor theorized that Ramon idolized defendant and was more than willing to do as he directed.

Defense counsel argued the prosecution's theory of the case made no sense. Defense counsel argued that defendant's initial encounter with M.J. was not a big deal; defendant was obviously drunk and M.J. continued cleaning the parking area, with nothing to suggest that he was hurt or upset. Defense counsel argued that the incident was over by the time Ramon came along, and there was no evidence that defendant or Rudy said anything to him about it. Defense counsel maintained that Rudy made an effort to get Ramon in the car by cutting him off as he walked towards the store. Defense counsel argued there was no evidence defendant knew Ramon had a gun or intended to shoot Singh. He argued the gun was only visible to defendant for two or three seconds before the fatal shots were fired, which was not enough time for defendant to form the requisite intent. Defense counsel emphasized that defendant was drunk and argued that he seemed almost to walk into the line of fire, suggesting he did not know that shots would be fired. Defense counsel ended by opining that the prosecutor had failed to prove beyond a reasonable doubt that defendant knew Ramon had a gun and failed to prove that he had the specific intent to kill.

The jury returned a verdict after deliberating for one full day and two partial days. The jury found defendant guilty of second-degree murder and found the firearm enhancement to be true. The trial court sentenced defendant to 15 years to life in prison, plus an additional year for the firearm enhancement. This appeal timely followed.

ECF No. 9-6, pgs. 2-6.

B.    **Procedural History**

On February 1, 2019, a jury convicted Petitioner of second-degree murder with a firearm enhancement.  See id., pg. 1 (California Court of Appeal decision in People v. Lopez, case no. C090537).  The trial court sentenced Petitioner to a total aggregate term of 16 years to life.  See id.  Petitioner appealed his conviction to the California Court of Appeal, alleging the same constitutional violations he raises in this petition.  The California Court of Appeal affirmed the conviction and sentence.  See id.  The California Supreme Court denied review without comment or citation.  See ECF No. 9-8 (California Supreme Court decision in People v. Lopez,

7

1    case no. S270699).  Petitioner did not seek certiorari in the United States Supreme Court, and he

2    filed no state court post-conviction actions.  See ECF No. 9.

3

4                                      **II. DISCUSSION**

5              Petitioner raises a single claim in his petition.  Specifically, Petitioner contends:

6    "Insufficient evidence that appellant aided and abetted, the people failed to establish beyond a

7    reasonable doubt that appellant intended to kill Mr. Singh and the judgment must be reversed."

8    ECF No. 1, pg. 2.  Respondent argues Petitioner is not entitled to federal habeas relief because the

9    state court's decision was neither contrary to nor based on an unreasonable application of clearly

10   established federal law.  See ECF No. 10.

11             When a challenge is brought alleging insufficient evidence, federal habeas corpus

12   relief is available if it is found that, upon the record of evidence adduced at trial, viewed in the

13   light most favorable to the prosecution, no rational trier of fact could have found proof of guilt

14   beyond a reasonable doubt.  See Jackson v. Virginia, 443 U.S. 307, 319 (1979).[2]  Under Jackson,

15   the court must review the entire record when the sufficiency of the evidence is challenged on

16   habeas.  See id.  It is the province of the jury to "resolve conflicts in the testimony, to weigh the

17   evidence, and to draw reasonable inferences from basic facts to ultimate facts."  Id.  "The question

18   is not whether we are personally convinced beyond a reasonable doubt.  It is whether rational

19   jurors could reach the conclusion that these jurors reached."  Roehler v. Borg, 945 F.2d

20   303, 306 (9th Cir. 1991); see also Herrera v. Collins, 506 U.S. 390, 401-02 (1993).  The federal

21   habeas court determines sufficiency of the evidence in the context of the substantive elements of

22   the criminal offense, as defined by state law.  See Jackson, 443 U.S. at 324 n.16.

23

24             [2]     Even though Jackson was decided before AEDPA's effective date, this expression

25   of the law is valid under AEDPA's standard of federal habeas corpus review.  A state court
     decision denying relief in the face of a record establishing that no rational jury could have found

26   proof of guilt beyond a reasonable doubt would be either contrary to or an unreasonable
     application of the law as outlined in Jackson.  Cf. Bruce v. Terhune, 376 F.3d 950, 959 (9th Cir.

27   2004) (denying habeas relief on sufficiency of the evidence claim under AEDPA standard of
     review because a rational jury could make the finding at issue).

28

1    In rejecting Petitioner's claim on direct appeal, the California Court of Appeal

2  stated:

3          Defendant challenges the sufficiency of the evidence to support the
   conviction for second degree murder. He argues the evidence showed only
4  that he was present at the scene but failed to show he was aware of
   Ramon's murderous intent or aided and abetted Ramon in shooting Singh.
5  We are not persuaded.
           In reviewing the sufficiency of the evidence, "the reviewing court
6  must determine from the entire record whether a reasonable trier of fact
   could have found that the prosecution sustained its burden of proof beyond
7  a reasonable doubt. In making this determination, the reviewing court
   must consider the evidence in a light most favorable to the judgment and
8  presume the existence of every fact the trier could reasonably deduce from
   the evidence in support of the judgment. . . . The test is whether substantial
9  evidence supports the decision, not whether the evidence proves guilt
   beyond a reasonable doubt." (*People v. Mincey* (1992) 2 Cal.4th 408,
10  432.) So long as there is substantial evidence, the appellate court must
   affirm, even if other substantial evidence would have supported a different
11  result. (*Bowers v. Bernards* (1984) 150 Cal.App.3d 870, 874.)

12                              * * *

13          Defendant was tried as an aider and abettor. "[A] person aids and
   abets the commission of a crime when he or she, acting with (1)
14  knowledge of the unlawful purpose of the perpetrator; and (2) the intent or
   purpose of committing, encouraging, or facilitating the commission of the
15  offense, (3) by act or advice aids, promotes, encourages or instigates, the
   commission of the crime." (<u>People v. Beeman</u> (1984) 35 Cal.3d 547, 561.)
16  In a murder case, this means that "the aider and abettor must know and
   share the murderous intent of the actual perpetrator." (<u>People v. McCoy</u>
17  (2001) 25 Cal.4th 1111, 1118.) "However, the aider and abettor need not
   have advance knowledge of the crime or the perpetrator's intent. 'Aiding
18  and abetting may be committed "on the spur of the moment," that is, as
   instantaneously as the criminal act itself.' " (<u>People v. Frandsen</u> (2019) 33
19  Cal.App.5th 1126, 1148.)
           Although ordinarily mere failure to prevent a crime is not enough
20  to constitute aiding and abetting (<u>People v. Culuko</u> (2000) 78 Cal.App.4th
   307, 331), it is among the factors that may be considered, as are presence
21  at the scene of the crime, companionship, and conduct before and after the
   offense. (<u>People v. Nguyen</u> (2015) 61 Cal.4th 1015, 1054; <u>In re Juan G.</u>
22  (2003) 112 Cal.App.4th 1, 5; <u>In re Lynette G.</u> (1976) 54 Cal.App.3d 1087,
   1094-1095.) " 'Whether defendant aided and abetted the crime is a
23  question of fact, and on appeal all conflicts in the evidence and reasonable
   inferences must be resolved in favor of the judgment.' " (<u>People v.</u>
24  <u>Campbell</u> (1994) 25 Cal.App.4th 402, 409.)
           Defendant argues no evidence shows he was aware of Ramon's
25  murderous intent or took any affirmative action to aid or abet the murder.
   We disagree. The evidence showed that defendant and Ramon were
26  especially close. Defendant had an unpleasant encounter with M.J. in the
   parking lot. Ramon showed up less than five minutes later. He spoke with
27  Rudy and defendant for approximately 40 seconds. He then approached
   M.J. Ramon punched M.J. within two minutes of arriving at the gas
28  station. Defendant can be seen smiling and laughing as Ramon precipitates

the altercation. From this evidence, the jury could reasonably infer that defendant encouraged Ramon to pick a fight with the gas station attendant, setting in motion the chain of events that would lead to Singh's death.

Approximately 11 seconds elapsed between the time Ramon punched M.J. and the time he shot Singh. During this time, defendant emerged from the car and Ramon retreated from the broom-wielding M.J. Ramon crossed in front of defendant and stopped less than a car-length away, well within defendant's direct line of sight. The video shows defendant watching as Ramon withdraws the gun from his waistband and racks the slide. The video also shows defendant raising his arm and pointing at Singh. The video then shows defendant advancing towards Singh with arm outstretched, still pointing and seeming to smile. We have watched the video several times and have little difficulty concluding that defendant's gesture and demeanor could reasonably be construed as encouragement to shoot. That defendant may not have had advance knowledge that Ramon would shoot Singh does not convince us otherwise. (People v. Frandsen, supra, 33 Cal.App.5th at p. 1148 [aiding and abetting may be committed " ' "on the spur of the moment" ' "].)

Defendant's subsequent actions further support the view that he intentionally facilitated or encouraged the shooting. Although defendant reacted to the gunfire by hunching his shoulders and bringing his arm to his chest, nothing suggests he was surprised or frightened by Ramon's actions. If anything, defendant's demeanor suggests he was unsurprised, raising an inference he supported Ramon's intentions. (People v. Campbell (1994) 25 Cal.App.4th 402, 409 [evidence that defendant was unsurprised by another's conduct supported the inference that the defendant acted to assist the conduct].) After the shooting, defendant calmly turned and walked away. He made no attempt to check on Singh or call for help. This conduct, too, supports an inference that defendant aided and abetted the murder. (See, e.g., People v. Hoang (2006) 14 Cal.App.4th 264, 270 [a person's making no attempt to determine whether a victim was injured or call for help supported the inference that the person aided and abetted an assault].) On the record before us, we conclude that substantial evidence supports the jury's finding that defendant offered support and encouragement to Ramon, thereby aiding and abetting the murder.

Defendant offers an alternative interpretation of the evidence. He rejects the prosecutor's theory that the encounter with M.J. set in motion a chain of events that ended with the shooting. He argues the encounter was "very brief" and "quickly diffused." He observes there was no direct evidence that anyone discussed the incident with Ramon. He notes that M.J. had been watching Ramon, giving Ramon an independent reason to approach and confront him. He emphasizes the rapidity with which events escalated, calling particular attention to the abbreviated time (two or three seconds) in which Ramon produced the gun and racked the slide. He observes that someone in his position could have believed that Ramon was brandishing the gun for purposes of intimidation. He renews the argument that he was merely motioning for Singh to get back, not signaling for Ramon to shoot.[4] He insists he was merely present at the scene, noting that he was also very drunk. We need not address these arguments, as they amount to nothing more than an invitation to reweigh the evidence, which we cannot do. As we have explained, there was substantial evidence

///

///

10

that defendant shared Ramon's murderous intent and aided and abetted the shooting. The existence of conflicting evidence is not grounds for reversal.

[N.4] Defendant also argues that he "was already gesturing with his finger at Mr. Singh prior to Ramon retrieving the firearm from his waistband." The video does not support this contention.

ECF No. 9-6, pgs. 7-10.

Respondent contends:

Petitioner claims that there is no evidence he encouraged the shooter or was aware of the shooter's intent. But the California Court of Appeal pointed to evidence that Petitioner talked with the shooter immediately before he initiated the confrontation, and again after the shooter was struck by the gas station attendant. Petitioner watched as the shooter withdrew a gun from his waistband, and then Petitioner pointed at the victim, who the shooter then killed. Petitioner fails to demonstrate that no reasonable juror could draw the inference that this behavior encouraged the shooter and that Petitioner intended for the shooter to attack the victim.

ECF No. 10, pg. 10.

Petitioner's claim is narrowly focused on the intent element of aiding and abetting in the homicide. See ECF No. 1, pg. 67. The trial court instructed the jury pursuant to CALCRIM No. 401 – an instruction Petitioner does not challenge – that to prove that the defendant is guilty of a crime based on aiding and abetting, the People must prove the following elements: (1) the perpetrator committed the crime; (2) the defendant knew that the perpetrator intended to commit the crime; (3) before or during the commission of the crime, the defendant intended to aid and abet the perpetrator in committing the crime; and (4) the defendant's words or conduct did in fact aid and abet the perpetrator's commission of the crime. See ECF No. 9-1, pg. 199.

Based on the facts recited by the state court, it was adduced at trial that Petitioner had a conversation with M.J. shortly before Ramon arrived on the scene. Once Ramon arrived, video evidence depicts Petitioner, Ramon, and Rudy having a conversation, resulting in Ramon punching M.J. Within eleven seconds of punching M.J., Ramon shot and killed Mr. Singh. It was further adduced at trial that when Ramon pulled out his gun, Petitioner also raised his arm, pointing at Mr. Singh. When the shots were fired, Petitioner hunched his shoulders and brought

1   his arm to his chest.  It was further adduced at trial that Petitioner calmly left the scene without

2   calling for help or approaching Mr. Singh to check on him.

3            This Court agrees with Respondent and the state court that, when viewed in the

4   light most favorable to the prosecution, this evidence is sufficient to allow a rational jury to

5   convict.  A reasonable jury could conclude from the facts adduced at trial that the Ramon, the

6   perpetrator, fired the gun that resulted in the homicide of Mr. Singh.  This satisfied the first

7   aiding-and-abetting element – that the perpetrator committed the crime.  A reasonable jury could

8   also conclude that Petitioner knew the perpetrator intended to commit the crime as Petitioner

9   conversed with the perpetrator shortly prior to the punching of M.J. and the shooting of Mr.

10  Singh.  This satisfies the intent requirement of the second element.  Additionally, satisfying the

11  third element, Petitioner witnessed Ramon pull out his gun, to which Petitioner subsequently

12  raised his hand pointing to Mr. Singh.  A jury could conclude Petitioner intended to aid and abet

13  in the crime because of the aforementioned actions, but also because Petitioner calmly left the

14  incident without demonstrating any concern for Mr. Singh's injuries.  Finally, a reasonably jury

15  could consider the evidence as a whole to conclude Petitioner's words or conduct, as illustrated

16  above, did in fact aid and abet the perpetrator's commissioner of the crime, satisfying the fourth

17  element.

18           Based on the foregoing, the Court finds that the state court applied the appropriate

19  federal standard under Jackson and that its determination was not based on an unreasonable

20  application of the facts to that standard.  Petitioner is not entitled to federal habeas relief, and his

21  petition should be denied.

22  / / /

23  / / /

24  / / /

25  / / /

26  / / /

27  / / /

28  / / /

1

### III.  CONCLUSION

2           Based on the foregoing, the undersigned recommends that Petitioner's petition for

3    a writ of habeas corpus, ECF No. 1, be denied.

4           These findings and recommendations are submitted to the United States District

5    Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within 14 days

6    after being served with these findings and recommendations, any party may file written objections

7    with the court.  Responses to objections shall be filed within 14 days after service of objections.

8    Failure to file objections within the specified time may waive the right to appeal.  See Martinez v.

9    Ylst, 951 F.2d 1153 (9th Cir. 1991).

10

11   Dated:  September 10, 2025

12                                                        _____
                                                         DENNIS M. COTA
13                                                       UNITED STATES MAGISTRATE JUDGE

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28